[This opinion has been published in *Ohio Official Reports* at 70 Ohio St.3d 512.]

ILLINOIS CONTROLS, INC. ET AL., APPELLEES AND CROSS-APPELLANTS, *v.*

LANGHAM ET AL., APPELLANTS AND CROSS-APPELLEES.

[Cite as *Illinois Controls, Inc. v. Langham*, 1994-Ohio-99.]

*Contracts—Provision which gives party exclusive right to market product on behalf of another impose duty to employ reasonable efforts to generate sales of the product—Parol evidence directed to nature of a contractual relationship is admissible, when—Corporation liable for breach of a pre-incorporation agreement executed on its behalf, when—Promoters of corporation who execute a contract on its behalf are personally liable for its breach, when—Corporation and its promoters jointly and severally liable for breach of pre-incorporation agreement, when—Civ.R. 8, construed.*

1. A contractual provision which gives a party the exclusive right to market a product on behalf of another imposes upon that party a duty to employ reasonable efforts to generate sales of the product. (1 Restatement of the Law 2d, Contracts [1981] 197, Section 77, Comment d, Illustration 9, adopted.)

2. Parol evidence directed to the nature of a contractual relationship is admissible where the contract is ambiguous and the evidence is consistent with the written agreement which forms the basis of the action between the parties.

3. A corporation is liable for the breach of a pre-incorporation agreement executed on its behalf by its promoters where the corporation expressly adopts the agreement or benefits from it with knowledge of its terms. (1 Restatement of the Law 2d, Agency [1958] 213, Section 84, Comment d, and 269, Section 104, adopted.)

4. The promoters of a corporation who execute a contract on its behalf are personally liable for the breach thereof irrespective of the later adoption of

the contract by the corporation unless the contract provides that performance thereunder is solely the responsibility of the corporation. (2 Restatement of the Law 2d, Agency [1958] 77, Section 326, adopted.)

5.  Where a corporation, with knowledge of the agreement's terms, benefits from a pre-incorporation agreement executed on its behalf by its promoters, the corporation and the promoters are jointly and severally liable for breach of the agreement unless the agreement provides that performance is solely the responsibility of the corporation or, subsequent to the formation of the corporate entity, a novation is executed whereby the corporation is substituted for the promoters as a party to the original agreement.

6.  Civ. R. 8(A) requires only that a pleading contain a short and plain statement of the circumstances entitling the party to relief. A party is not required to plead the legal theory of recovery or the consequences which naturally flow by operation of law from the legal relationship of the parties.

(No. 92-2212—Submitted January 4, 1994—Decided October 12, 1994.)

APPEAL and CROSS-APPEAL from the Court of Appeals for Cuyahoga County, No. 60730.

———————————

{¶ 1} Defendant-appellant and cross-appellee, Michael Langham, is the inventor of a device called the cross-slope monitor ("CSM"). The device is employed as an accessory for heavy-duty road graders to assure a consistent angle in the course of highway construction. On July 1, 1983, appellant applied to obtain a patent on the CSM. Thereafter, appellant began to market the device as an accessory to John Deere equipment through his unincorporated business, Langham Engineering.

{¶ 2} The CSM, if properly installed, possessed substantial cost advantages over other methods. Todd Hale, a long-term employee of Langham Engineering, was an expert in the proper installation technique.

{¶ 3} In the fall of 1983, Langham Engineering began to sell CSMs for use on John Deere A Series construction equipment. During the next fifteen months, Langham Engineering sold between ninety and one hundred of the devices through techniques such as demonstrations and consignments. However, John Deere's share of the road grader market was relatively small. Appellant wanted to penetrate the larger market represented by Caterpillar Tractor Company ("CAT"). At the time, CAT sales accounted for fifty-five to sixty percent of the world market in heavy construction equipment.

{¶ 4} In order to exploit this opportunity, appellant contacted Caterpillar Venture Capital ("CAT Venture") for the purpose of locating someone who could market the CSM as an accessory to CAT equipment. CAT Venture, in turn, introduced appellant to plaintiffs-appellees and cross-appellants Balderson, Inc. ("BI") and its president, Clark Balderson.

{¶ 5} In late February 1985, appellant and appellees commenced negotiations to form a new corporation to manufacture and market a CSM for use on CAT equipment. During negotiations, Clark Balderson represented to appellant that he was prepared to invest $250,000 in working capital toward the development of the project. On May 31, 1985, appellees commissioned a marketing plan to determine the feasibility of the enterprise. The plan envisioned that BI would market the CSM to end users of CAT equipment worldwide. The plan projected annual sales of the CSM to be seven hundred thirty units in 1986, eight hundred eighty-seven units in 1987 and one thousand eighty-four units in 1988. BI personnel expressed similarly favorable projections on September 24, 1985 and October 24, 1985. The marketing plan also envisioned that sales of the CSM would be limited to CAT equipment and was presented to appellant on that basis.

{¶ 6} Appellant and appellees eventually decided to form a separate corporate entity which would manufacture and market the CSM for use on CAT equipment. However, it was agreed that the new entity must first satisfy its

preexisting financial obligations. While appellant and his company were current on their existing debt, he nevertheless owed $185,000 on a bank loan and $83,000 to appellants and cross-appellees Joseph and Catherine Flaherty, his father-in-law and mother-in-law, for business loans. Moreover, Clark Balderson and BI sought to confine their future business relationship to appellant alone. Accordingly, they sought to remove the financial interests in Langham Engineering owned by appellant's partner, Drew Sellett, and Al Lamb, an investor. Thus, appellant was persuaded to incur approximately $599,000 in personal debt to purchase the interests of Drew Sellett and Al Lamb for $161,000 and $250,000, respectively, and assume $188,000 in bank debt incurred by Drew Sellett on behalf of Langham Engineering. Clark Balderson supplied the $250,000 to purchase Al Lamb's interest, and appellant executed a promissory note payable to Balderson for that amount. Appellees told appellant that the debt incurred to purchase Lamb's and Sellett's interests would be assumed by the new entity. Langham Engineering thus became a sole proprietorship before its assets were acquired by the new entity. The new corporation, called Illinois Controls, Inc. (appellee and cross-appellant), was organized for the purpose of manufacturing and marketing the CSM for use on CAT equipment.

{¶ 7} On October 4, 1985, the parties executed a pre-incorporation agreement ("PIA") to create the new corporation. The PIA was signed by Clark Balderson individually and in his representative capacity as president of BI.

{¶ 8} The PIA provided in relevant part:

"WHEREAS, the parties hereto desire to organize and operate a corporation to be established under the laws of the State of Ohio which shall manufacture and sell cross slope monitors (and other products) throughout the world.

"NOW, THEREFORE, *pursuant to the mutual covenants herein contained, the parties hereto agree as follows*:

"ARTICLE I. Formation of New Company.

"Promptly after the date of this agreement, [BI, Clark Balderson] and [Michael] Langham shall cause, in collaboration with each other, a new company (hereinafter referred to as "Newco" [now known as Illinois Controls, Inc.]) to be incorporated under the laws of the State of Ohio.

"ARTICLE II. Newco Objectives.

"*The object of Newco is to combine the resources, technical capabilities and production experience of Langham with the* resources, engineering expertise and *marketing capabilities of [BI]* and the leadership capabilities of [Clark Balderson] *in order to establish operating efficiencies in the* production and *marketing of cross slope monitors* and such other related products as is [*sic*] mutually acceptable to the parties by maintaining the capability to provide an assured source of such products *to [BI] for marketing*." (Emphasis added.)

{¶ 9} Appellant was required to contribute $12,500 in cash and the assets of Langham Engineering to the enterprise, including the assignment of the CSM patent. In exchange, Illinois Controls was to assume the liabilities of appellant and Langham Engineering in the approximate amount of $651,000. Moreover, the PIA required Clark Balderson to contribute $37,500 and BI to contribute $250,000 in cash to the enterprise. In exchange for these contributions, Clark Balderson was to receive seven hundred sixty shares of common stock in Illinois Controls while appellant was to receive two hundred forty shares. The agreement further designated Clark Balderson as Chairman of the Board of Directors and President of Illinois Controls and appellant as vice-president. Appellant received an initial salary of $75,000 per year. Appellant was also to receive royalties of five percent of the sale price of every CSM sold by Illinois Controls as well as royalties for future products employing the cross-slope technology. On October 8, 1985, the CSM patent was granted to appellant. Thereafter, Illinois Controls began to manufacture and market the CSM for use on CAT equipment. However, instead of the $250,000 promised by Clark Balderson for CSM production, as early as October

1985 he indicated that he intended to spend only $20,000. Moreover, instead of the $225,000 envisioned in the marketing plan for promoting the CSM in the first two years, only $60,000 to $80,000 was actually committed to this goal.

{¶ 10} In addition, BI failed to adequately train and motivate its sales force to aggressively inform end users about the CSM's capabilities. Significantly, Clark Balderson recognized these inadequacies but made no efforts to correct them.

{¶ 11} The fortunes of Illinois Controls were also affected by the challenges inherent in the marketing of a new product. Such a product needs to achieve visibility. Mere advertising is insufficient. Demonstrations or consignment sales and incentives for the sales force are also necessary. Again, Clark Balderson was aware of the need for these strategies, but no incentives were ever provided, nor was the product demonstrated in sufficient quantities to establish its visibility.

{¶ 12} Sales of the CSM were also hampered by the inability or unwillingness of BI to assure its operational success. The accuracy of a precision instrument such as the CSM was dependent upon its proper calibration and installation. However, BI personnel did not have the necessary expertise. Accordingly, there was no assurance that the CSM would perform properly once installed.

{¶ 13} These difficulties were compounded by BI's failure to develop proper installation manuals for the CSM. While the CSM could be used on twenty-six variations of CAT equipment, installation manuals were prepared for only two, further undermining its success.

{¶ 14} A final component in the success of the CSM was the support it received from CAT and CAT dealers. BI had maintained a largely exclusive business relationship with CAT. Thus, BI attachments were generally limited to use on CAT equipment. This relationship gave CAT a special advantage over rivals in the industry due to its ability to offer attachments not available on competing products. In return, BI enjoyed the cooperation and assistance of CAT in the

marketing of BI's products. This relationship between BI and CAT was precisely the reason appellant sought an affiliation with appellees.

{¶ 15} Nevertheless, in June 1986, when Illinois Controls was in full production of the CAT CSM, Clark Balderson ordered appellant to develop a version of the product for a new series of John Deere graders. This split in production focus hurt Illinois Controls' ability to supply CAT-compatible CSMs. It also undermined the exclusive relationship that Illinois Controls had initially cultivated with CAT through BI. Appellant objected to the John Deere project, as did John Fruhwirth, president of Illinois Controls at the time and vice-president of finance for BI. Clark Balderson ignored their protests and, as a result, sales of the CAT CSM suffered.

{¶ 16} Concerned that BI's dealings with John Deere might jeopardize BI's relationship with CAT, Clark Balderson sought to conceal BI's involvement by creating a separate entity called Dymax Corporation ("Dymax") in January 1986. However, because the CSM was unique, it was not difficult for CAT to determine that Illinois Controls was the real source of CSMs sold for use with CAT competitors. The effort to market the CSM to CAT competitors ultimately damaged its sales to CAT dealers and undermined the financial viability of Illinois Controls. Clark Balderson recognized this risk and pursued the new strategy in spite of it.

{¶ 17} In early 1987, Clark Balderson terminated all but one person engaged in manufacturing the CSM. On June 3, 1987, Clark Balderson, in an attempt to sell the CSM technology to Spectra-Physics, Inc., represented the value of "the product, patents, drawings, inventory, documents, jigs, fixtures, [and] tooling equipment" associated therewith to be $4 million.

{¶ 18} On July 16, 1987, Clark Balderson announced his intent to close the Illinois Controls plant and shift CSM production to the BI manufacturing plant in Wamego, Kansas. From December 1985 to September 1987, Illinois Controls sold

approximately forty CAT CSMs. On September 10, 1987, appellant offered to assign his CSM patent to Illinois Controls in exchange for Balderson's assumption of Langham Engineering's debt as provided in the PIA. However, Balderson refused. Instead, he intended to persuade appellant to sign over certain assets, including the patent, to Illinois Controls and then deprive the enterprise of necessary operating funds. Thereafter, BI would acquire the assets of Illinois Controls as a preferred creditor in a bankruptcy proceeding while assuring that the debt personally assumed by appellant on behalf of Illinois Controls remained with him.

{¶ 19} On or about October 1, 1987, Illinois Controls ceased operations. Appellant had received his salary of $75,000 in 1986 and $60,000 for 1987, but only ten percent of the royalties owed to him under the PIA were ever paid. Finally, none of the more than $600,000 in debt incurred by appellant personally to create Illinois Controls was assumed or discharged.

{¶ 20} On December 23, 1987, appellees Illinois Controls, BI and Clark Balderson instituted this action for declaratory judgment, injunctive relief and monetary damages against appellants Michael and Patricia Langham and Joseph and Catherine Flaherty. Appellants answered and counterclaimed. Michael and Patricia Langham counterclaimed against appellees for breach of the PIA (Count One). The Langhams and the Flahertys counterclaimed against Illinois Controls for its failure to assume the pre-existing debt owed to the Flahertys by Langham Engineering (Count Eight).

{¶ 21} On June 21, 1990, appellees filed a motion *in limine* seeking to exclude expert testimony with respect to lost profits. On August 6, 1990, a jury trial commenced. John R. Nevin, a professor of business and Chairman of the Department of Marketing at the University of Wisconsin, testified for appellants that BI's June 1985 marketing study correctly recognized that the CSM was a high technology product very different from the mechanical implements traditionally

8

sold by BI and correctly anticipated the marketing challenges presented by the introduction of such a product. Significantly, the study acknowledged that Balderson currently lacked the expertise to adequately market the CSM. Likewise, Professor Nevin testified that BI's May 1985 marketing study disclosed BI's awareness that the CSM lacked market visibility. Moreover, other documents revealed that BI was aware of the need for consignment sales and demonstrations and for sufficient promotional funds. Professor Nevin concluded that BI's promotion, training and sales efforts were insufficient to achieve success for the product. Finally, Professor Nevin concluded that BI's effort to market a CSM for John Deere equipment through Dymax hurt the relationship between Illinois Controls and CAT, specifically by reducing support from CAT and CAT dealers.

{¶ 22} However, the trial court did not allow Professor Nevin to testify on appellant's loss of future profits as a result of appellees' inadequate marketing efforts.

{¶ 23} On August 17, 1990, the jury rendered a verdict in favor of appellants Michael and Patricia Langham and against appellees Clark Balderson, BI and Illinois Controls on Count One of the counterclaim under the promoter liability theory, awarding damages for breach of contract of $539,000 against Clark Balderson, $1,375,000 against BI and $752,000 against Illinois Controls. $454,000 of this amount was allocated to Clark Balderson and $298,000 to BI. The jury also returned a verdict in favor of appellants Joseph and Catherine Flaherty on Count Eight of the counterclaim under the promoter liability theory, awarding $110,000 in damages against Illinois Controls for its failure to assume the pre-existing debt of Langham Engineering, allocating $66,000 of this amount to Clark Balderson and $44,000 to BI.

{¶ 24} Appellees appealed and appellants cross-appealed. On September 28, 1992, the Eighth District Court of Appeals reversed the judgment of the trial

court entered on the jury verdict and affirmed the judgment of the court excluding expert testimony with respect to lost profits.

**{¶ 25}** The cause is now before this court pursuant to the allowance of a motion and cross-motion to certify the record.

————————————

*Calfee, Halter & Griswold*, *John J. Eklund*, *William E. Coughlin* and *David J. Carney*, for appellees and cross-appellants.

*Nurenberg, Plevin, Heller & McCarthy Co., L.P.A.*, *Leon M. Plevin*, *John J. McCarthy* and *Joel Levin*, for appellants and cross-appellees.

————————————

**A. WILLIAM SWEENEY, J.**

I

**{¶ 26}** The present action requires us to determine the obligations created by the pre-incorporation agreement ("PIA"), whether such obligations have been breached and, if so, what parties are liable therefor. Appellees contend that the reference in the PIA to the marketing capabilities of Clark Balderson and BI was merely prefatory and therefore created no marketing obligation. The court of appeals agreed.

**{¶ 27}** We are unable to concur in this conclusion. A review of the PIA reveals that the only "prefatory" language appears in the "whereas clause," which set forth the parties' desire to manufacture and sell CSMs. Significantly, Article II of the agreement, which recites Balderson's marketing obligations, is introduced by the following phrase: "NOW, THEREFORE, *pursuant to the mutual covenants herein contained*, the parties hereto *agree as follows*." (Emphasis added.) The agreement leaves little doubt that marketing of the CSM was one of the "covenants" to which the parties "agreed" in the introductory sentence.

**{¶ 28}** Even if it were not expressly set forth in the PIA, appellees would still have the obligation to exert reasonable efforts to market the CSM. In *Wood v.*

10

*Lucy, Lady Duff-Gordon* (1917), 222 N.Y. 88, 118 N.E. 214, the defendant, Lucy, Lady Duff-Gordon, was a self-described "creator of fashions." Creations bearing her name enjoyed a heightened level of market acceptance due to her association therewith. The plaintiff, Otis Wood, and the defendant agreed that he was to have the exclusive right, subject to her approval, to market products bearing her name. In exchange, defendant was to receive fifty percent of the profits derived from the enterprise. Rejecting defendant's claim that no binding contract existed because there was no mutuality of obligation, Judge Cardozo, writing for the court, concluded that plaintiff's implied promise to market defendant's fashions supplied the necessary consideration.

{¶ 29} Appellees question *Wood*'s applicability, contending that mutuality of obligation is not an issue in the present case.

{¶ 30} However, *Wood* is instructive in its description of the plaintiff's obligation and the strong resemblance that it bears to responsibilities assumed by the appellees in the case at bar. Judge Cardozo remarked:

"The implication [of a clause in the agreement] is that the plaintiff's business organization will be used for the purpose for which it is adapted. But the terms of the defendant's compensation are even more significant. Her sole compensation for the grant of an exclusive agency is to be one-half of all the profits resulting from the plaintiff's efforts. Unless he gave his efforts, she could never get anything. *Without an implied promise, the transaction cannot have such business 'efficacy as both parties must have intended that at all events it should have.' * * * His promise to pay the defendant one-half of the profits and revenues resulting from the exclusive agency and to render accounts monthly, was a promise to use reasonable efforts to bring profits and revenues into existence. For this conclusion, the authorities are ample*. * * *" (Emphasis added.) 22 N.Y. at 91-92, 118 N.E. at 215.

**{¶ 31}** In this case, as in *Wood*, the obligor gained the exclusive right to market the product in return for a percentage of the revenues. Moreover, as in *Wood*, the goal of the enterprise and appellant's receipt of royalties could be achieved only if appellees exerted reasonable efforts to market the product. The promise to perform such an undertaking is neither illusory nor indefinite. See 1 Restatement of the Law 2d, Contracts (1981) 197, Section 77, Comment *d*, Illustration 9.

**{¶ 32}** Consequently, we hold that a contractual provision which gives a party the exclusive right to market a product on behalf of another imposes upon that party a duty to employ reasonable efforts to generate sales of the product.

**{¶ 33}** The PIA makes this obligation clear. Evidence at trial further demonstrated that the parties intended to exploit Balderson's access to the heavy equipment market and, particularly, to CAT. Michael Langham testified that this was the *raison d'etre* for his collaboration with Balderson. This view was echoed by John Fruhwirth and Professor Nevin.

**{¶ 34}** Appellees contend that this testimony constituted inadmissible parol evidence. However, the testimony is in accord with Balderson's marketing obligation set forth in the PIA. In Ohio, parol evidence directed to the nature of a contractual relationship is admissible where the contract is ambiguous and the evidence is consistent with the written agreement which forms the basis of the action between the parties. See *Watson v. Lamb* (1907), 75 Ohio St. 481, 79 N.E. 1075; *Hildebrand v. Fogle* (1851), 20 Ohio 147, 157.

**{¶ 35}** The testimony at issue merely expounded upon appellees' marketing obligation to which the agreement refers. The testimony established the importance of Balderson's access to the CAT accessory market for a new product such as the CSM. Indeed, this was the basis of the agreement. Even assuming that the PIA did not clearly describe appellees' marketing obligation, such evidence was admissible

to explain the methods for attaining common objectives.[1]  It is axiomatic that, where a contract is ambiguous, parol evidence may be employed to resolve the ambiguity and ascertain the intention of the parties.  See *In Re Estate of Fulk* (1940), 136 Ohio St. 233, 239, 16 O.O. 273, 276, 24 N.E.2d 1020, 1023; *Bowman v. Tax Comm.* (1939), 135 Ohio St. 295, 300, 14 O.O. 189, 191, 20 N.E. 2d 916, 918; *Merchants Natl. Bank v. Cole* (1910), 83 Ohio St. 50, 59, 93 N.E. 465, 467.

{¶ 36} From a review of the PIA and the evidence, it is apparent that appellees agreed to use their best efforts to market the CSM.  We must, therefore, further determine whether the evidence supports the jury's  determination that appellees had breached this duty.  The parties were aware before the agreement was executed that certain marketing strategies must be followed for the product to succeed.  Both parties acknowledged that approximately $225,000 over a two-year period was required to establish the product.  Nevertheless, only $60,000 to $80,000 was actually committed.

{¶ 37} Clark Balderson, prior to the PIA's execution, told appellant that he would invest $250,000 in Illinois Controls to assure an ample supply of CSMs for the CAT market.  However, only $20,000 was committed to the manufacture of the device.

{¶ 38} Appellees were aware of the importance of proper training of the sales force, proper installation, demonstrations and consignment sales and the exclusive relationship of Illinois Controls with CAT.  Despite this awareness, no attempts were made to address these concerns.  With respect to the final issue, Clark Balderson's actions transcended mere neglect of his marketing obligation.  He sacrificed the exclusive relationship Illinois Controls was seeking to cultivate with CAT in order to sell CSMs to CAT competitors through Dymax.

---

1. Such evidence has been expressly recognized as admissible to assist in the construction of pre-incorporation agreements.  See *Mosier v. Parry* (1899), 60 Ohio St. 388, 402, 54 N.E. 364, 367; Henn & Alexander, Laws of Corporations and Other Business Enterprises (3 Ed. 1983) 248, Section 108.

**{¶ 39}** Such evidence taken as a whole was more than ample for the jury to conclude that appellees breached their good faith obligation to make reasonable efforts to promote the sale of the CSM. Professor Nevin testified that an ineffective or half-hearted attempt to promote a product will impair or destroy its chances for success. The CSM was the only product sold by Illinois Controls. Clark Balderson placed the value of the company at $4 million when he sought to sell it. Thus, the failure to employ reasonable efforts to market the CSM destroyed its potential and doomed a company worth $4 million.

II

**{¶ 40}** Appellees further challenge the award of damages in favor of appellants Michael and Patricia Langham and against appellee Illinois Controls in the amount of $752,000, and the allocation of $454,000 of this sum to Clark Balderson and $298,000 to BI. The liability of Illinois Controls under the contract arises from the relationship between Clark Balderson and BI as corporate promoters and Illinois Controls as the resulting corporate entity.

**{¶ 41}** The legal relationship between a promoter and the corporate enterprise he seeks to advance is analogous to that between an agent and his principal. Thus, legal principles governing the relationship are derived from the law of agency. See Henn & Alexander, *supra*, at 253, Section 111; 1 Restatement of the Law 2d, Agency (1958) 216, Section 84, Comment *d*; 2 Restatement of the Law 2d, Agency (1958) 78, Section 326, Comment *b*.

**{¶ 42}** Where an agent purports to act for a principal without the latter's knowledge, the principal may nevertheless be liable on obligations arising from the transaction if the principal later adopts or ratifies the agreement arising from the transaction or receives benefits from the agreement with knowledge of its terms. See 1 Restatement of the Law 2d, Agency (1958), Sections 82 and 98. This is true even where the principal lacked capacity at the time of the transaction giving rise

to the obligation if, after obtaining such capacity, the principal manifests acceptance of the transaction. See *id.*, Sections 104 and 84, Comment *d*.

{¶ 43} Likewise, a corporation, which is incapable of authorizing an agreement made on its behalf prior to its existence, may nevertheless adopt the agreement after its incorporation. Adoption may be manifested by the corporation's receipt of the contract's benefits with knowledge of its terms. See *City Bldg. Assn. No. 2 v. Zahner* (1881), 6 Ohio Dec. Rep. 1068; *Reif v. Williams Sportswear, Inc.* (1961), 9 N.Y. 2d 387, 214 N.Y.S.2d 395, 174 N.E.2d 492; Henn & Alexander, *supra*, at 253-254, Section 11, fn. 6.

{¶ 44} A corporation is therefore liable for the breach of an agreement executed on its behalf by its promoters where the corporation expressly adopts the agreement or benefits from it with knowledge of its terms.

{¶ 45} The record discloses substantial evidence of the benefits conferred upon Illinois Controls by Michael Langham pursuant to the PIA. These benefits include the exclusive use of the CSM patent and the manufacturing capabilities of the Spring Valley facility previously operated by Langham Engineering, the titles to two motor vehicles, and appellant's engineering and technical expertise, which enabled the corporation to produce its sole stock in trade, the CSM. It is therefore beyond dispute that the corporation knowingly derived benefits from the agreement executed on its behalf.

{¶ 46} There was also sufficient evidence that Illinois Controls breached the PIA, resulting in damages to appellants. In exchange for Langham Engineering's assets, Illinois Controls was to assume its debts and the debt assumed by Michael Langham to facilitate the creation of the corporation. However, despite the transfer of certain assets, Michael Langham's offer to transfer the remaining assets, and Illinois Controls' exclusive use of Langham Engineering resources, the corporation never assumed the debt as promised, leaving Michael Langham responsible for personal debt amounting to approximately $784,000 (*i.e.*, $185,000

in pre-existing debt and $599,000 worth of additional obligations). In addition to the unassumed debt, appellant was owed a minimum of $10,850 in unpaid royalties (*i.e.*, seventy units x $3,100 x five percent). This evidence more than supports the jury award of $752,000 in favor of Michael and Patricia Langham against Illinois Controls. Moreover, the jury award of $110,000 in favor of Joseph and Catherine Flaherty against Illinois Controls is clearly supported by evidence of the corporation's failure to assume the debt owed them as required in the PIA and the accrued interest on the debt from the date of the breach.

### III

**{¶ 47}** Appellees Clark Balderson and BI additionally question the assessment of damages against them for breach of the agreement by Illinois Controls.

**{¶ 48}** It is axiomatic that the promoters of a corporation are at least initially liable on any contracts they execute in furtherance of the corporate entity prior to its formation. See Henn & Alexander, *supra*, at 252, Section 111. The promoters are released from liability only where the contract provides that performance is to be the obligation of the corporation, *Mosier v. Parry* (1899), 60 Ohio St. 388, 404, 54 N.E. 364, 367; 1 Seaver, Ohio Corporation Law (1989) 25, Section 9(d)(i); the corporation is ultimately formed, Henn & Alexander, *supra*, at 252, Section 111, fn. 1 and 2; and the corporation then formally adopts the contract, 1 Seaver, *supra*, at 26, Section 9(d)(ii).

**{¶ 49}** It is generally recognized that where a pre-incorporation agreement merely indicates that it is undertaken on behalf of a corporation, the corporation will not be exclusively liable in the event of a breach. Under such circumstances the promoters of the corporation remain liable on the contract. See *RKO-Stanley Warner Theatres, Inc. v. Graziano* (1976), 467 Pa. 220, 355 A. 2d 830; 1A Fletcher, Cyclopedia of the Law of Private Corporations (1993) 465, Section 215.

{¶ 50} Formation of the corporation following execution of the contract is a prerequisite to any release of the promoters from liability arising from the pre-incorporation agreement. Inasmuch as the promoter-corporation relationship is based on agency principles, a promoter will not be released from liability if the corporation is never formed, because one may not be an agent for a nonexistent principal. See 1A Fletcher, supra, at 465, Section 215; 2 Restatement of the Law 2d, Agency (1958), Section 326; Henn & Alexander, *supra*, at 252, Section 111.

{¶ 51} Moreover, mere adoption of the contract by the corporation will not relieve promoters from liability in the absence of a subsequent novation. See Ballantine, Manual of Corporation Law & Practice (1930) 163, Section 47a; 1A Fletcher, *supra*, at 329, Section 190; Henn & Alexander, *supra*, at 255, Section 111. This view is founded upon "the well-settled principle of the law of contracts that a party to a contract cannot relieve himself from its obligations by the substitution of another person, without the consent of [the] other party." Ballantine, *supra*, at 163. See, also, *Chapin v. Longworth* (1877), 31 Ohio St. 421. Consequently, the promoters of a corporation who execute a contract on its behalf are personally liable for the breach thereof irrespective of the later adoption of the contract by the corporation unless the contract provides that performance thereunder is solely the responsibility of the corporation.

{¶ 52} Applying these principles to the facts of the present case, we find that the promoters remain personally liable on the pre-incorporation agreement. While the corporation was subsequently formed as envisioned in the contract, the agreement does not state that the parties intended that the corporate entity was to be exclusively liable for any breach. Even if the agreement did so provide, there is no evidence that the corporation, once formed, formally adopted it.

{¶ 53} Under the circumstances presented herein, both the promoters and the corporation are liable under the contract. See 1A Fletcher, *supra*, at 329, Section 190. The corporation is liable because it accepted benefits conferred by the

PIA with knowledge of its terms. The promoters are liable because the corporation never formally adopted the PIA, and the PIA does not make the corporation solely responsible for the obligations arising thereunder.

IV

{¶ 54} Inasmuch as both the promoters of Illinois Controls and the corporation itself are liable, the nature of this shared liability remains to be determined. While our research has failed to discover an Ohio decision which has addressed this specific issue, resort to agency principles is, again, instructive. The relationship between a promoter and a corporation to be formed can be compared to the relationship between an agent and an undisclosed principal. Where a contract is made in furtherance of the interests of an undisclosed principal, both the principal and the agent are liable for breach of its underlying obligations. See *Hutchinson v. Wheeler* (1862), 85 Mass. (3 Allen) 577; *North Carolina Lumber Co. v. Spear Motor Co.* (1926), 192 N.C. 377, 382, 135 S.E. 115, 117-118; *Lincoln Joint Stock Land Bank v. Bexten* (1933), 125 Neb. 310, 321, 250 N.W. 84, 88. Under such circumstances, the agent and the undisclosed principal are jointly and severally liable for breach of the agreement. See *Crown Controls, Inc. v. Smiley* (1988), 110 Wash. 2d 695, 704, 756 P. 2d 717, 721; *Engelstad v. Cargill, Inc.* (Minn. 1983), 336 N.W.2d 284, 286; *Grinder v. Bryans Rd. Bldg. & Supply Co., Inc.* (1981), 290 Md. 687, 706-707, 432 A.2d 453, 463-464; *Traylor v. Grafton* (1975), 273 Md. 649, 676, 332 A.2d 651, 668 (applying Pennsylvania law); *Joseph Melnick Bldg. & Loan Assn. v. Melnick* (1949), 361 Pa. 328, 335, 64 A.2d 773, 777; *Williamson v. O'Dwyer & Ahern Co.* (1917), 127 Ark. 530, 192 S.W. 899; *Lull v. Anamosa Natl. Bank* (1900), 110 Iowa 537, 542, 81 N.W. 784, 786; *Cobb v. Knapp* (1877), 71 N.Y. 348, 353; *Beymer v. Bonsall* (1875), 79 Pa. 298; 2 Restatement of the Law 2d, Judgments (1982) 37, Section 49, Comment *c*; Ferson, Undisclosed Principals (1953), 22 U.Cin.L.Rev. 131, 142-144. See, also, *Maple v. Cincinnati, Hamilton & Dayton RR. Co.* (1883), 40 Ohio St. 313, 316-318 (joint and several liability

between agent and disclosed principal for fraud committed by agent without knowledge of principal). To the extent that *Campbell v. Murdock* (S.D. Ohio 1950), 90 F. Supp. 297, is at variance with the foregoing authorities, it is disapproved.

{¶ 55} These holdings are consistent with the shared liability for a contractual obligation undertaken by a promoter on behalf of a yet-to-be-formed corporation. See *State v. Indus. Tool & Die Works, Inc.* (1945), 220 Minn. 591, 601-602, 21 N.W.2d 31, 37, fn. 2; *Universal Industries Corp. v. Lindstrom* (1983), 92 App. Div. 2d 150, 152, 459 N.Y.S. 2d 492, 494; *Ratner v. Cent. Natl. Bank of Miami* (Fla. App. 1982), 414 So.2d 210, 212; *Malisewski v. Singer* (App. 1979), 123 Ariz. 195, 197, 598 P.2d 1014, 1016; 1A Fletcher, *supra*, at 329 and 465, Sections 190 and 215; Ballantine, *supra*, at 163, Section 47a.

{¶ 56} We therefore conclude that where a corporation, with knowledge of the agreement's terms, benefits from a pre-incorporation agreement executed on its behalf by its promoters, the corporation and the promoters are jointly and severally liable for breach of the agreement unless the agreement provides that performance is solely the responsibility of the corporation or, subsequent to the formation of the corporate entity, a novation is executed whereby the corporation is substituted for the promoters as a party to the original agreement

{¶ 57} It is therefore unnecessary to consider the argument of appellees that there was insufficient evidence to support the conclusion that Clark Balderson and BI were the alter ego of Illinois Controls so as to permit the corporate veil of the latter entity to be pierced. Rather, Illinois Controls and the promoters thereof (Clark Balderson and BI) are jointly and severally liable to appellants for breach of the PIA.

V

{¶ 58} Appellees further maintain that the judgment against them is precluded because appellants did not assert the promoter theory in their complaint. Civ. R. 8(A) requires only that a pleading contain a short and plain statement of the

circumstances entitling the party to relief. A party is not required to plead the legal theory of recovery or the consequences which naturally flow by operation of law from the legal relationships of the parties. "The rules make clear that a pleader is not bound by any particular theory of a claim but that the facts of the claim as developed by the proof establish the right to relief." McCormac, Ohio Civil Rules Practice (2 Ed. 1992) 102, Section 5.01. See, also, *Fancher v. Fancher* (1982), 8 Ohio App. 3d 79, 82, 8 OBR 111, 115, 455 N.E.2d 1344, 1347-1348; 4 Anderson's Ohio Civil Practice (1987) 272-273, Section 151.03.

{¶ 59} Accordingly, it was sufficient that appellants set forth facts which, if proven, established their claim for relief. It was not incumbent upon them to plead the law which created the liability of each defendant for breach of contract or which rendered them jointly and severally liable under the PIA. See *Scandinavian-American Bank v. Wentworth Lumber Co.* (1921), 101 Ore. 151, 157, 199 P. 624, 626; 1A Fletcher, *supra*, at 459-460, Section 213.

VI

{¶ 60} Appellants also challenge the trial court's order excluding evidence of lost profits. Appellants proffered Professor Nevin's testimony to establish that lost profits resulting from appellees' breach could be proved with reasonable certainty. The trial court concluded that the evidence was too speculative. Such a determination will not be reversed on appeal absent an abuse of discretion. See *AGF, Inc. v. Great Lakes Heat Treating Co.* (1990), 51 Ohio St.3d 177, 182, 555 N.E. 2d 634, 639; *Peters v. Ohio State Lottery Comm.* (1992), 63 Ohio St.3d 296, 299, 587 N.E.2d 290, 292. From our review of the proffered evidence, we discern no abuse of discretion on the part of the trial court in granting the motion *in limine*.

{¶ 61} The judgment of the court of appeals is therefore affirmed in part and reversed in part, and the cause is remanded to the trial court for reinstatement of judgment.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

MOYER, C.J., WRIGHT, RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur.

DOUGLAS, J., concurs in judgment only.

———————————